

FILED
IN OPEN COURT

MAY 24 2018

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 1:18-CR-218 (TSE) |
| | ) | |
| KELLI R. DAVIS | ) | |
| | ) | |
| Defendant. | ) | |

### STATEMENT OF FACTS

The United States and the defendant, KELLI R. DAVIS, stipulate that the allegations in the one-count criminal information and the following facts are true and correct and that, had the matter gone to trial, the United States would have proven them beyond a reasonable doubt with competent and admissible evidence.

A. **Background**

1. The United States Department of State ("DoS") was a department of the United States government.

2. The Bureau of Educational and Cultural Affairs ("ECA") was part of the DoS's Public Diplomacy and Public Affairs branch. The ECA's diplomatic mission was to increase mutual understanding and the development of peaceful relations between the people of the United States and the people of other countries by means of educational, cultural, sports, and professional exchange programs, as well as public-private partnerships.

3. The Office of Citizen Exchanges ("OCE") was a bureau office within the ECA.

4. The Sports United Division, which was a component of the OCE, focused on sports exchange programs.

5. On or about February 15, 2011, the DoS awarded a federal grant to George Mason University's ("GMU") Center for Sport Management ("the grant") to run the DoS's Sports Visitor and Sports Envoy Program (the "Sports Visitor Program") through a cooperative agreement. GMU administered the grant on its main campus in Fairfax, Virginia, in the Eastern District of Virginia. The cooperative agreement and grant terms required the DoS to contribute funds to a series of two-week exchange programs for emerging athletes and coaches from select countries on an annual basis. While visiting the United States, program participants attended sporting events, workshops, and training seminars and they received opportunities to interact with professional, collegiate, and youth coaches, trainers, administrators, and players.

6. Between in or about 2011 and in or about early 2016, the Sports Visitor Program hosted approximately 1,128 participants for 62 groups. To staff and execute the Sports Visitor Program, the DoS gave GMU approximately $1.1 million to $1.4 million per year. The DoS supervised and controlled these grant funds by, among other things, monitoring and evaluating the program, overseeing GMU's expenditures and requiring quarterly reports, and retaining the right to approve or disapprove program expenses.

7. The DoS obtained interpreters who would accompany each foreign delegation during their program visit. One interpreter was responsible for covering costs and expenses for each program group. The expenses incurred by the interpreters were paid in the following manner: (a) prior to each program visit, an estimated trip cost would be established for the program group and GMU would pay that amount to the interpreter's personal bank account by wire transfer; (b) GMU would then reconcile the amount paid as an estimated trip cost with actual trip expenses based on invoices supplied by the interpreter after the completion of the trip; (c) any amount of the estimated trip cost that was not expended was supposed to be refunded to

GMU; and (d) a GMU program official would later certify to the DoS and the Grants Officer Representative that the costs expended on the grant were in accordance with the terms of the grant.

8. The defendant, KELLI R. DAVIS ("DAVIS"), was a DoS employee who was assigned to the ECA as a Program Specialist. DAVIS also served as the DoS's Grants Officer Representative and Program Manager for the Sports Visitors Program between in or about February 2011 and in or about March 2016. As the Grants Officer Representative, DAVIS was responsible for administering different aspects of the grant between the DoS and GMU, including developing programs and itineraries for the group participants, analyzing budgets and expenditures, approving quarterly expense reports, and working closely with GMU's staff and program office.

9. DENON T. HOPKINS ("HOPKINS") operated Complete Transportation, LLC (d/b/a "Complete Limousine") and served as the company's de facto owner. HOPKINS and DAVIS were friends and associates. Between in or about October 2014 and in or about March 2016, HOPKINS provided bus and limousine services for the Sports Visitor Program. During this time-period, Complete Transportation received approximately $247,200.76 in grant funds for transportation services.

10. PERSON B was DAVIS' boyfriend and associate.

11. During the time-period when DAVIS served as the DoS's Grants Officer Representative, DAVIS frequently accompanied the participants to program events and she frequently stayed in the same hotels as the group participants, including complimentary hotels within the Washington, D.C. area.

## B. The Scheme to Defraud

12. Between in or about February 2011 and at least in or about March 2016, in the Eastern District of Virginia and elsewhere, the defendant, KELLI R. DAVIS, HOPKINS, PERSON B, and others known and unknown, knowingly conspired and agreed: (a) to steal and convert to their use and the use of others, money and property, of a value exceeding $1,000, of the goods and property of the United States and the DoS, in violation of 18 U.S.C. § 641; and (b) to devise and intend to devise a scheme and artifice to defraud and deprive the DoS and the citizens of the United States of their right to the honest and faithful services of DAVIS, a DoS Program Specialist and Grants Officer Representative and the Program Manager for the Sports Visitor Program, through kickbacks and the concealment of material information, and to cause wire communications to be transmitted in interstate commerce for the purpose of executing such scheme, in violation of 18 U.S.C. §§ 1343 and 1346.

13. The nature and purpose of the conspiracy included the following: (a) to steal and convert to the personal use of the conspirators and others money and property belonging to the United States government and the DoS; (b) to enrich the conspirators and others by obtaining and retaining money and property to which the conspirators were not entitled; and (c) to conceal the nature and purpose of the theft of federal money and the scheme and artifice to defraud.

14. The conspirators carried out the conspiracy through the following manner and means, among others:

    a. After Complete Transportation was awarded the contract to supply transportation services to the Sports Visitor Program, HOPKINS—in addition to providing legitimate transportation services—began assisting DAVIS with creating itineraries for program

visits; locating vendors who would provide sports-related presentations, services, or events; and generating invoices for the vendors, which were paid by the assigned interpreter.

      b.    DAVIS and HOPKINS either generated false invoices for non-existent vendors and inflated invoices for legitimate vendor services or knew that false invoices for non-existent and inflated invoices for legitimate vendor services were being submitted to the assigned interpreter for payment. The assigned interpreter used DoS grant funds that had been advanced to the interpreter to pay the false and inflated invoices. The assigned interpreter typically wrote a personal check to the specified vendor and DAVIS and HOPKINS would collect the checks. Occasionally, the assigned interpreter would provide cash to DAVIS and HOPKINS in lieu of a check.

      c.    When receiving personal checks from the assigned interpreter made payable to a specified vendor, HOPKINS, in some instances, forged the payee's signature on the endorsement line and made it appear that the endorsed, third party check had been signed over in a manner that allowed HOPKINS to deposit the checks into a Complete Transportation bank account that HOPKINS maintained and controlled. HOPKINS then converted the money to personal use. DAVIS knew that HOPKINS would thereafter use portions of these DoS grant funds to pay off certain personal bills or debts on behalf of DAVIS.

      d.    Through the use of interstate wire transfers, HOPKINS deposited approximately 74 fraudulent checks, totaling approximately $17,335.00, into the Complete Transportation bank account. During the same time period, HOPKINS, also through the use of interstate wire transfers, used the Complete Transportation bank account and credit cards in his name and the name of others to pay some of DAVIS' personal expenses, including, among other things, payments on her car and cellular telephone bills and the purchase of a cellular telephone.

These payments from HOPKINS to DAVIS totaled between approximately $10,040.66 and $12,066.66. In addition, HOPKINS provided other free limousine services to DAVIS and DAVIS' relatives and friends.

  e. DAVIS and HOPKINS attempted to conceal the scheme by, among other things, generating false program itineraries, communicating by personal e-mail, and providing false information to federal law enforcement officials, officials from the DoS and GMU, and the assigned interpreters or by knowing that such attempts to conceal were being undertaken by the other.

  f. DAVIS also stole, embezzled, and converted federal funds to personal use by, among other things: (a) providing friends and family members with event tickets purchased with DoS grant funds; (b) purchasing meals for unauthorized persons with DoS grant funds; (c) submitting to DoS approximately 26 false claims for per diem when DAVIS' meals and incidental expenses were paid using DoS grant funds; and (d) assisting PERSON B in submitting false and inflated invoices for catering services. DAVIS' theft of federal funds totaled at least $17,777.94.

15. The government's evidence would show that the following steps, among others, were taken in furtherance of the conspiracy.

  a. On or about December 7, 2015, HOPKINS contacted DAVIS and asked her if she wanted him to buy her concert tickets. In turn, DAVIS sent text messages to HOPKINS instructing him to purchase four concert tickets for DAVIS and others using federal funds from the Sports Visitor Program.

  b. On or about December 28, 2015, HOPKINS, to make a monthly payment on DAVIS' car loan, electronically transferred approximately $537.95 from a Complete

Transportation bank account to DAVIS' loan account maintained by Nissan Motor Acceptance Corporation.

   c. On or about January 11, 2016, HOPKINS used an ATM in Washington, D.C. to negotiate and deposit 12 vendor checks, totaling approximately $2,900, into a Complete Transportation bank account. The grant funds used by the interpreter/payor to cover these checks were originally sent by wire transfer from a GMU bank account maintained in the Eastern District of Virginia to the interpreter's out-of-state bank account.

   d. On or about February 17, 2016, DAVIS sent text messages and e-mails to HOPKINS instructing him to pay overdue amounts on DAVIS' cellular telephone account with Verizon.

   e. On or about February 23, 2016, HOPKINS used an ATM in Rockville, Maryland to negotiate and deposit seven vendor checks, totaling approximately $1,200, into a Complete Transportation bank account. The DoS grant funds used by the interpreter/payor to cover these checks were originally sent by wire transfer from a GMU bank account maintained in the Eastern District of Virginia to the interpreter's out-of-state bank account.

   f. On or about February 25, 2016, HOPKINS, to make a payment on DAVIS' cellular telephone account, electronically transferred approximately $722.69 from a Complete Transportation bank account to DAVIS' account with Verizon.

**C.**   **Conclusion**

  16. The acts taken by the defendant, KELLI R. DAVIS, in furtherance of the offense(s) charged in this case, including the acts described above, were done willfully and knowingly and with the specific intent to violate the law. The defendant acknowledges that the foregoing statement of facts does not describe all of the defendant's conduct relating to the

offense(s) charged in this case nor does it identify all of the persons with whom the defendant may have engaged in illegal activities.

Respectfully submitted,

Tracy Doherty-McCormick
Acting United States Attorney

By: /s/ Sullivan
Edward P. Sullivan
Special Assistant United States Attorney (LT)
Kimberly R. Pedersen
Assistant United States Attorney
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, Virginia 22314
Tel: 703-299-3700
edward.p.sullivan@usdoj.gov
kimberly.pedersen@usdoj.gov

-9-

After consulting with my attorney and pursuant to the plea agreement entered into this day between the defendant, Kelli R. Davis, and the United States, I hereby stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

_____
Kelli R. Davis
Defendant

I am Kelli R. Davis' attorney. I have carefully reviewed the above Statement of Facts with her. To my knowledge, her decision to stipulate to these facts is an informed and voluntary one.

_____
Andrea Moseley, Esq.
Attorney for Kelli R. Davis